UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
                        )
UNITED STATES OF AMERICA )
                        )
     v.                 )    Cr No. 00-122 S
                        )
TIMI WALLACE,           )
                        )
          Petitioner.   )
                        )
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Before the Court is Petitioner Timi Wallace's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 ("Motion").[1] (ECF No. 258.)  For the reasons that follow, the Motion is DENIED in its entirety.

---

[1] Petitioner has also filed a motion requesting an evidentiary hearing. (ECF No. 268.)  However, a petitioner is not entitled to an evidentiary hearing in a § 2255 proceeding as a matter of right. David v. United States, 134 F.3d 470, 477 (1st Cir. 1998) (citing United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993)).  The First Circuit has stated that, even if requested, a hearing is unnecessary when a § 2255 motion is "inadequate on its face;" the petitioner's "allegations, even if true, do not entitle him to relief;" or the petitioner's "allegations 'need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible.'" Id. (quoting McGill, 11 F.3d at 225-26).  It is the petitioner's burden to establish the need for an evidentiary hearing. McGill, 11 F.3d at 225.  Petitioner has not met that burden.  Therefore, the Court finds no need for an evidentiary hearing, and Petitioner's motion for an evidentiary hearing is DENIED.

I.   Background and Travel[2]

On October 18, 2000, Petitioner and his brother Nickoyan Wallace were indicted on charges relating to the September 25, 2000 armed robbery of a firearms store, D & B Guns, in Providence, Rhode Island.  On October 15, 2004, following a jury trial, Petitioner was convicted on charges of robbery (Count I), conspiracy to commit armed robbery (Count II), theft of firearms from a federally licensed firearms dealer (Count III), and brandishing a firearm during and in relation to a crime of violence (Count IV).  He was sentenced on January 21, 2005, to 300 months' imprisonment.

In his first appeal, Petitioner challenged both his conviction and his sentence.  With respect to his conviction, Petitioner raised four errors by the prosecution and the Court.  As to his sentence, Petitioner argued that this Court erred in its calculation of the applicable guidelines range under the United States Sentencing Guidelines ("Guidelines"), its application of the Guidelines' factors to justify an upward

---

[2] For a more complete factual and procedural history of this case, see United States v. Wallace, 461 F.3d 15 (1st Cir. 2006) ("Wallace I"); United States v. Wallace, 573 F.3d 82 (1st Cir. 2009) ("Wallace II").

departure from the Guidelines range,[3] and the overall reasonableness of his sentence. Petitioner's conviction was affirmed, but the First Circuit remanded to this Court for resentencing to correct errors in the application of the Guidelines' factors for an upward departure from the applicable Guidelines range.

On May 25, 2007, Petitioner was resentenced to a 294 month term of imprisonment. Petitioner appealed again, raising a number of challenges to the sentence imposed by this Court on remand. The First Circuit affirmed the sentence.

Petitioner filed the instant Motion on July 6, 2011.

II. Overview

Petitioner raises fifteen grounds for relief including claims related to due process, ineffective assistance of counsel, prosecutorial misconduct, jurisdiction, and sentencing. As many of his claims overlap, they will be grouped accordingly.

With the exception of Ground Fifteen, Petitioner states that "[n]one of the claims presented in the foregoing [Motion] ha[ve] [been] so presented before any federal court, and that was a result of counsel's failure to so raise the issues." (Mot. 11, ECF No. 258.) With the exception of Ground Fifteen,

---

[3] Petitioner's initial sentence exceeded the high end of the Guidelines range calculated in the pre-sentence investigation report ("PSR") by nine years.

3

this Court primarily addresses the claims for the limited purpose of determining whether Petitioner's counsel was ineffective.

III. Discussion

    A.   Law

        1.   Section 2255

Generally, the grounds justifying relief under 28 U.S.C. § 2255(a) are limited. A court may grant relief when it finds either that a conviction and/or sentence was entered without proper jurisdiction, a constitutional error, or a fundamental error of law. United States v. Addonizio, 442 U.S. 178, 185 (1979). "[A]n error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" Id. (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). Moreover, § 2255 is not a substitute for direct appeal. Knight v. United States, 37 F.3d 769, 772 (1st Cir. 1994) (citing Addonizio, 442 U.S. at 184-85).

        2.   Strickland

"The Sixth Amendment guarantees defendants the right to effective assistance of counsel." Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). However, "[t]he Constitution does

4

not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." United States v. Natanel, 938 F.2d 302, 309-10 (1st Cir. 1991).

A defendant who claims that he was deprived of his Sixth Amendment right to effective assistance of counsel must demonstrate: (1) "that counsel's performance fell below an objective standard of reasonableness;" and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687-88, 694; see also United States v. Manon, 608 F.3d 126, 131 (1st Cir. 2010). In assessing the adequacy of counsel's performance, a defendant "'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' and the court then determines whether, in the particular context, the identified conduct or inaction was 'outside the wide range of professionally competent assistance.'" Manon, 608 F.3d at 131 (quoting Strickland, 466 U.S. at 690). With respect to the prejudice requirement, a "reasonable probability is one sufficient to undermine confidence in the outcome. . . . In making the prejudice assessment, [the court] focuses on the

fundamental fairness of the proceeding." Id. (internal quotations omitted). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

Strickland instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.

B.   Claims of Error

1.   Grounds One and Two

Petitioner alleges in Ground One that his Fifth and Sixth Amendment rights to due process were violated because the indictment failed "to charge the offense of 'aiding and abetting' as an offense [or] material element of the crime[s] charged in counts I, III, and IV of the indictment. . . ." (Mot. 5, ECF No. 258.)   Relatedly, Petitioner claims in Ground Two that the Court "impermissibly amended the indictment by reciting the statute to the jury after they gave notice that the indictment did not charge it; and for instructing them on said uncharged offense." (Id. at 6.)   In both claims of error, Petitioner asserts that counsel was "ineffective for failing to raise the[se] issue[s]" at trial and on appeal. (Id. at 5, 6.)

Counts I, III, and IV of the indictment and superceding indictment all alleged violations of 18 U.S.C. § 2, which provides that:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Petitioner argues, however, that "[r]eference to 18 U.S.C. § 2 is not enough," and that the indictment was fatally flawed because it failed to "mention the words 'aiding and abetting' (18 U.S.C. § 2(a)) or 'willful' (18 U.S.C. § 2(b)), etc." (Aff. of Mem. in Supp. of Habeas Corpus per § 2255 ("Mem.") 6, ECF No. 258-2.)

To support his argument, Petitioner cites <u>In re Winship</u>, among other cases, for the general rule that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. 358, 364 (1970). (Mem. 3, ECF No. 258-2.)  However, the First Circuit has held that "[a]n aider and abettor charge is implicit in all indictments for substantive offenses, so it need not be specifically pleaded for an aiding and abetting conviction to be returned." <u>United States v. Footman</u>, 215 F.3d 145, 153-54 (1st Cir. 2000) (quoting <u>United States v. Sabatino</u>, 943 F.2d 94, 99-100 (1st Cir. 1991)); <u>see also</u> <u>United States v. Keene</u>, 341 F.3d 78, 84 (1st Cir. 2003) ("[A] charge of aiding and abetting is implicit in indictments for substantive offenses.") (citing <u>Footman</u>, 215 F.3d at 153-54).  Therefore, Petitioner's claim that the indictment was defective is rejected.

In addition, Petitioner's statement that he only became aware that he was also being charged with "aiding and abetting" when the jury asked about the charge is specious. Both the original and superceding indictments alleged a violation of 18 U.S.C. § 2. In its opening remarks, this Court noted that Petitioner was charged with aiding and abetting. (Trial Tr., Vol. 1 11.)[4] The Government also referred to aiding and abetting during its closing argument. (Trial Tr., Vol. 3 116.) Finally, in its instructions to the jury, the Court included an instruction on the elements of aiding and abetting. (Id. at 179.)

Turning to Ground Two, the Court's response to the jury's question about the aiding and abetting statute[5] was also proper. The Court repeated the question for the record, explained where

---

[4] The citations to the transcripts are as follows: "Trial Tr., Vol 1" reflects the proceedings on October 12, 2004; "Trial Tr., Vol. 2" for October 13, 2004; "Trial Tr., Vol. 3" for October 14, 2004; "Trial Tr., Vol. 4" for October 15, 2004; "Sentencing Tr." for January 21, 2005; and "Resentencing Tr." for May 24, 2007.

[5] The jury posed the following question:

In reading the indictment, we questioned the charge of aiding [and] abetting. We do not find that charge on the verdict sheet and would like to know the following: One, are we to make a decision on this charge? Two, would that be associated with our decision on any other charge? Three, may we make a decision on aiding and abetting independent of the other charges?

(Trial Tr., Vol. 4 2.)

aiding and abetting appeared in the superceding indictment, re-read its instructions to the jury on aiding and abetting, and provided some explanation. (Trial Tr., Vol. 4 2-6.) Neither the Government nor the defendant objected to the Court's response. (Id. at 6.)

The First Circuit has already addressed—and rejected—the arguments Petitioner makes to this Court. See Footman, 215 F.3d at 154 ("When aiding and abetting is involved . . . the 'counsels, commands, induces, or procures' and 'cause' language from § 2 is properly part of the jury's instruction."). Moreover, because the indictment was not defective or impermissibly amended, there was nothing to which counsel could have reasonably objected or appealed. Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999) ("[C]ounsel's performance was not deficient if he declined to pursue a futile tactic."). Further, Petitioner would not have been prejudiced by any error because he was not sentenced separately for aiding and abetting. (Resentencing Tr. 66-68.) Accordingly, the Court finds that Grounds One and Two do not entitle Petitioner to the relief sought.

### 2. Grounds Three and Four

In Ground Three, Petitioner alleges a violation of his due process right to confront a witness against him. (Mot. 8, ECF

10

No. 258; Mem. 9, ECF No. 258-2.)  Specifically, Petitioner challenges: (1) the Government's use of certain Southwest Airlines flight reservation records without making the Southwest Airlines employee who had produced the records pursuant to a subpoena available; and (2) the use of a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent's testimony regarding the records as "constituting (impermissible) confrontation via 'proxy'" (Mem. 9, ECF No. 258-2.)[6]  Relatedly, Petitioner alleges in Ground Four that counsel was ineffective "for failing to make the necessary investigations into [his] alibi whereabouts in Tucson, AZ, in order to produce evidence at trial to affirmatively rebut the Government's position/use of the flight reservation records." (Mot. 9, ECF No. 258.)

The Sixth Amendment to the United States Constitution provides, in relevant part, that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

---

[6] The flight records pertained to a Southwest Airlines reservation made on August 28, 2000, in the names of Devon Lewis, Petitioner's alias, and James Coleman, Petitioner's cousin, for a round trip flight departing on August 30, 2000, from Providence to Phoenix and returning on September 20, 2000. (Trial Tr., Vol. 3 25-27; Wallace I, 461 F.3d at 28.) Petitioner challenged the Government's use of these flight records on direct appeal, but only on evidentiary grounds. Id. Specifically, he argued that the records were irrelevant because "there was no foundation linking him to that reservation," and that the evidence was unfairly prejudicial. Id.  The First Circuit rejected the evidentiary challenges to the admission of the flight records. Id.

the witnesses against him . . . ." The Supreme Court has held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Crawford v. Washington, 541 U.S. 36, 68-69 (2004). Testimonial statements of witnesses absent from trial have been admitted only when the declarant was unavailable to testify and the defendant had a prior opportunity to cross-examine that declarant. Id. at 59, 68.

Crawford established a distinction however, between testimonial and non-testimonial statements. Id. at 56. In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court further addressed the distinction between testimonial and nontestimonial statements: "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324.

Here, there is no indication that the Southwest Airlines records were created for use against Petitioner at trial. Rather, they were created in the normal course of the airline's business (Mot. Ex. C, Edwards Aff. ¶ 3, ECF No. 258-7), and were

certified as such (Trial Tr., Vol. 3 25-26). These records are nontestimonial, therefore, there was no need for the Southwest Airlines employee to appear to testify at Petitioner's trial. Petitioner's Sixth Amendment right to confront witnesses against him was not violated.

Moreover, because the records are nontestimonial, there was similarly no need for the ATF Special Agent (Troiano) to testify as a "proxy" for the airline employee. Rather, Special Agent Troiano simply testified that, as part of his investigation of Petitioner's proferred alibi, he obtained a certified copy of business records from Southwest Airlines pursuant to subpoenas issued to all major airlines flying between the Providence and Boston areas and the Tucson and Phoenix areas. (Trial Tr., Vol. 3 20-21, 25-27.)

Based on the foregoing analysis, trial counsel cannot be faulted for not challenging the admission of the records based on the Sixth Amendment's confrontation clause.[7] See Dure v. United States, 127 F. Supp. 2d 276, 280 (D.R.I. 2001) ("Counsel cannot be deemed ineffective for failing to pursue futile arguments.") (citing Vieux, 184 F.3d at 64). Nor can appellate

---

[7] In fact, as Petitioner admits, trial counsel did object to the admission of the records as highly prejudicial, albeit, in Petitioner's view, without giving "full context." (Mem. 9, ECF No. 258-2; Trial Tr., Vol. 3 21-22.) The records were admitted over counsel's objection. (Trial Tr., Vol. 3 25, 26.)

counsel be faulted for failing to raise the issue on appeal. See id.

Petitioner's allegations regarding counsel's failure to investigate Petitioner's alibi will be discussed more completely infra. With respect to the part of Ground Four that claims ineffective assistance of counsel for failing "to produce evidence at trial to affirmatively rebut the Government's position/use of the flight reservation records" (Mot. 9, ECF No. 258), Petitioner states that:

> It is indisputable that the flight reservation records and the government's use of them, without full context, and unrebutted, were highly prejudicial as they portended to show, on their face, along with much extrapolation by the prosecutor . . . that [he] was in Rhode Island; made the reservation; and intended on returning . . . in time for the robbery. It can be adduced from the subsequent conviction that they contributed substantially to the verdict . . . as they remained not properly rebutted, and [his] alibi unsubstantiated, one need not question the crippling effect they had on his credibility/defense.

(Mem. 13-14, ECF No. 258-2 (ellipses in original).)

Petitioner's argument fails for multiple reasons.  First, the Government never stated that the flight was taken.  On the contrary, it elicited testimony from Special Agent Troiano that the flight was booked, but not taken. (Trial Tr., Vol. 3 27.) Further, during cross-examination, defense counsel elicited

definite testimony that the witness could not identify the individual who actually made the reservation. (Id. at 31-32.)

The Government did use the flight records to undercut Petitioner's alibi that he was in Arizona at the time of the robbery. (Trial Tr., Vol. 3 108.)  In its closing argument, the Government posited that, while the flight was never taken, the booking of the flight indicated that Petitioner was in or near Rhode Island when the reservation was made; that Petitioner never intended to relocate to Arizona permanently; and that Petitioner had intended to return to Rhode Island sometime in September. (Trial Tr., Vol. 3 108.)  Defense counsel countered by pointing out the lack of information regarding the reservation:

> Then there's this talk about booking a flight from Providence to Arizona and then back.  I submit to you, ladies and gentlemen, you don't know who booked that flight.  You don't know why it was booked.  We don't know if there was a reason for it.  We don't know if somebody else did it.  It was done.  We don't have any information.  All we know is there's a record of somebody booking a flight under those names with Southwest Airlines.  Nobody ever took the plane.

(Id. at 143.)

Second, Petitioner testified that it was "possible" that he made the reservation in question, (Trial Tr., Vol. 2 119,) a fact noted by the First Circuit.  United States v. Wallace, 461 F.3d 15, 28 (1st Cir. 2006) (Wallace I).  After initially

15

denying on cross-examination that he booked any flights under his alias, Devon Lewis, during that period (Trial Tr., Vol. 2 118), on redirect he was asked to clarify his response regarding the flight reservation:

> Q.  Let me ask you this.  You never took a plane from Arizona to anywhere else?
>
> A.  No.
>
> Q.  Did you -- I'm sorry.
>
> A.  Are you dealing with a specific time?
>
> Q.  Well, within the time from July, beginning of July 2000 to October of 2000.
>
> A.  No.  I never took a flight.
>
> Q.  Did you ever make a reservation to take a flight?
>
> A.  I'm not -- I mean, it's a long time.  It's possible, you know.

(Id. at 119.)

Third, as the First Circuit observed, there was a "crushing weight" of evidence to support the jury's verdict. Wallace I, 461 F.3d at 26.  It is difficult to imagine that the flight records alone had a "crippling effect" on Petitioner's credibility or defense.  The fact that the jury disbelieved Petitioner's alibi was based on all of the evidence presented, not just the flight records.

16

Petitioner has not overcome the presumption that, under the circumstances, his defense counsel's decision to focus on the lack of hard evidence linking Petitioner to the reservation and the fact that no one took the flight "might be considered sound trial strategy." Strickland, 466 U.S. at 689 (quoting Michel, 350 U.S. at 101). Moreover, even assuming that counsel erred in his choice of strategy, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691; see also Natanel, 938 F.2d at 310 ("That counsel's selection of a stratagem may, in retrospect, have proved unsuccessful, or even unwise, is not the issue."). As noted above, the jury's verdict was based on all of the evidence, not only the Southwest Airlines records. The Court, therefore, rejects Petitioner's contention that trial counsel was ineffective by choosing not to present alibi evidence to counter the Government's use of the flight records.

3.   Grounds Five and Eight

Grounds Five and Eight allege that the Government violated Petitioner's right to due process by the use of false testimony and evidence to convict him.[8] (Addendum to Mot. 1, ECF 258-1.)

---

[8] Although Petitioner does not specifically list ineffective assistance of counsel as a separate ground, in addressing why

17

In Ground Five, Petitioner claims that "the Government used false testimony to convict [him] in violation of the Laws and the Constitution of the United States." (Mem. 14, ECF No. 258-2.)   Similarly, in Ground Eight Petitioner claims that the Government used "wrongful means" and "false pretenses and presentations," namely "the procurement/use of partial, edited, corrupted and fabricated evidence . . .," in violation of his due process rights. (Id. at 20.)

The "false testimony" to which Petitioner refers in Ground Five is that of Audrey Giglio, specifically her testimony that Petitioner "was the man who dropped off his vehicle at East Coast Auto (in East Providence, RI) on September 14, 2000, to be shipped to Tucson, Arizona." (Id. at 14.)   Petitioner argues that "[t]his was an impossibility as [he] was in Arizona from the time of making the 'shipping reservation' on 9/11/2000, to the day the vehicle was dropped off on 9/14/2000, and beyond." (Id. at 14-15.)   Petitioner claims that the Government knew, or should have known, that Giglio's testimony was false based on evidence in its possession. (Id. at 15.)   The Government

---

any claims in the Motion had not been presented previously, he claims that "that was a result of counsel's failure to so raise the issues." (Mot. 11, ECF No. 258.)   The Court, reading the pro se Motion liberally, assumes that Petitioner intends to allege ineffective assistance of counsel in Grounds Five and Eight.

responds that there is no factual basis to support this claim. (Opp'n to Mot. 16, ECF No. 265.)

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264, 269 (1959) (internal citations omitted); see also United States v. Vega, 813 F.3d 386, 391 (1st Cir. 2016) ("Napue prohibits prosecutors from knowingly presenting false evidence, including false testimony, to the jury.  This prohibition applies even if the government does not solicit the false testimony and merely fails to correct it.") (internal citations omitted).

Giglio testified that she had a good memory of what the individual who dropped off the Land Rover for shipment to Arizona looked like; "instantly recognized" Petitioner from a photograph shown to her by a law enforcement officer on October 19, 2000; recognized the same photo shown to her at trial; and had no doubt that the person in the photo was the man who came to East Coast Auto on September 14, 2000.[9] (Trial Tr., Vol. 3 63-

---

[9] Giglio's testimony was corroborated by that of Thomas Patrick Conroy III, who, at the time of the robbery was a

64.)    Petitioner  argues  that  hotel  records  illustrate  the

"impossibility"  that  he  could  have  been  that  person.  (Mem. 14-

15,  ECF  No.  258-2.)    Petitioner  also  contends  that  Giglio's

testimony  is  "further  debunked"  by  call  detail  records  and  the

"fact"  that  his  brother,  Ojomo  Wallace,  was  the  one  who  dropped

off  the  vehicle  on  September  14,  2000.  (Id. at 15.)    Petitioner

overlooks,  however,  that  much  of  the  evidence  on  which  he  relies

was  presented  at  trial.

---

Warwick  police  officer  assigned  to  a  federal  task  force  as  a
special  agent.  (Trial  Tr.,  Vol.  3,  72-73.)    Officer  Conroy
testified  that  he  was  the  law  enforcement  officer  who  showed
Giglio  the  photograph  from  which  she  identified  Petitioner.
(Id. at 73-76.)    He  recalled  that  she  expressed  no  doubt  or
uncertainty  that  the  person  in  the  photograph  was  the  same
person  who  dropped  off  the  Land  Rover  on  September  14,  2000.
(Id. at 75-76.)  The  accuracy  of  eyewitness  identification  has
been  the  subject  of  substantial  research  into  the  variables  that
can  affect  its  reliability.  See, e.g., Nat'l  Research  Council,
The   Nat'l   Academies,   Identifying   the   Culprit:   Assessing
Eyewitness  Identification  (2014);  Dan  Simon,  In  Doubt:  The
Psychology  of  the  Criminal  Justice  Process  (2012).    "The
accuracy  of  identifications  is  sensitive  to  a  wide  range  of
factors  inherent  in  the  witnessing  conditions,  and  is  highly
susceptible  to  the  manner  in  which  the  identification  procedures
are  conducted."  Simon,  supra,  at  207.  In  addition,  empirical
research  has  demonstrated  that  "self-reported  confidence  at  the
time   of   trial   is   not   a   reliable   predictor   of   eyewitness
accuracy,"  Nat'l  Research  Council,  supra,  at  108,  but  immediate
recognition  accompanied  by  high  confidence  indicates  a  higher
level  of  accuracy  than  an  identification  that  an  eyewitness  made
after  mulling  over  a  photograph.  Simon,  supra,  at  82.   Here,  the
eyewitness  expressed  immediate  recognition  and  high  confidence
and  the  procedures  employed  appear  free  from  procedural  flaws.

The hotel records were produced by the general manager of the Crossland Economy Studios in Tucson, one of the motels at which Petitioner stayed. (Trial Tr., Vol. 3 36, 38-39.)   In addition, an employee who worked at the Motel 6 in Tucson (another motel where Petitioner testified he stayed), testified about a records search she performed at the request of an unnamed ATF agent a week prior to Petitioner's trial. (Id. at 51-55.)   The Motel 6 call records and cell phone records were obtained as a result of a Government subpoena.   (Trial Tr., Vol. 1 206, 207; Mot. Ex. D 2-8, ECF No. 258-8.)   Special Agent Troiano testified regarding the cell phone records. (Trial Tr., Vol. 1 207-09, 211-12; Trial Tr., Vol. 2 14-15.)   Petitioner's trial counsel cross-examined all three witnesses regarding the records (Trial Tr., Vol. 2 5-6, 20-22; Trial Tr., Vol. 3 44-45, 46-47, 54-57), and also referred to the records in his closing argument (Trial Tr., Vol. 3 125-28, 141-146).

Petitioner, however, argues that:

> [T]he call detail records for [his] mobile phone . . . shows calls being made to Giglio at East Coast Auto . . . and vice versa.  But most noteworthy is the phone call from Giglio to [him] on September 14, 2000, reminding him that the vehicle had to be dropped off and shipping paid for before close at five o'clock, that day.  Question: how could she call him in Arizona and expect him to be in Rhode Island before 5 p.m. that same day?  Impossible!  Likewise the call detail records for East Coast Auto's business phone will reflect the same.

(Mem. 15, ECF No. 258-2.)   Defense counsel posed a similar question with respect to the hotel records in his closing argument:

> How did Timi Wallace check out of a hotel or motel on September 13th in Arizona and get back to Rhode Island to send his car back to Arizona.  Does that make any sense?  No evidence of that.  The 13th he checks out of a hotel.  The 14th is the day it was getting sent here.

(Trial Tr., Vol. 3 141.)

At trial, Petitioner testified that he could not recall who shipped the Land Rover to Arizona. (Trial Tr., Vol. 2 73-74.)[10] In his Motion, however, Petitioner now claims that the "who" was Ojomo and Petitioner included an affidavit from Ojomo to that effect. (Mem. 15, ECF No. 258-2; Mot. Ex. E, ECF No. 258-9.) Ojomo avers that:

> In or about October of 2004, I was informed that during Timi's trial the issue of whether it was him who dropped off the [Land Rover] had come up, and that he told his attorney that it was in fact one of his family members who dropped his [Land Rover] off at the shipping company on September 14, 2000; that his attorney would be contacting the family to confirm Timi's claim.

---

[10] Despite his frequent lapses in memory during his testimony, ostensibly due to the length of time between events preceding the robbery and the robbery itself and the trial (see, e.g., Trial Tr., Vol. 2 119), Petitioner testified that he was certain he was not the person physically in Rhode Island who sent the vehicle to Arizona because "[he] was in Arizona at that time, Tucson" (Id. at 61-62, 73-74).

(Ojomo Aff. ¶ 4, Mot. Ex. E, ECF No. 258-9.)   Although Ojomo stated that "[n]one of our family members were contacted by Timi's attorney for confirmation of the issue o[r] as a possible defense witness" (id.), Petitioner provides no explanation as to why it took almost seven years from the time of his trial for Ojomo to come forward with this information which, presumably, would have supported Petitioner's alibi defense.   Ojomo's affidavit is too little too late.   There is simply no evidence in the record, other than this belated affidavit, to support the contention that it was Ojomo, not Petitioner, who delivered the Land Rover to East Coast Auto for delivery to Arizona.[11]

The Government observes that Petitioner "asserts that [Giglio's] testimony was false since it conflicted with his story — that he was in Arizona at the time." (Opp'n to Mot. 16, ECF No. 265.)   Petitioner again overlooks the fact that the jury rejected his alibi that he was in Arizona at the time of the robbery and, in fact, found that he had committed perjury. (Trial Tr., Vol. IV 23.)   Petitioner seems to be attempting to re-litigate his alibi, which is not the purpose of a § 2255 motion. See Chandler v. United States, CR No. 06-107-01-M, 2011

---

[11] Moreover, Petitioner's only evidence to contradict Giglio's testimony that Petitioner was the person who appeared at East Coast Auto on September 14, 2000 was a letter from a private detective, which will be discussed infra.

WL 6097378, at *3 (D.R.I. Dec. 6, 2011) (citing <u>United States v.</u> <u>Frady</u>, 456 U.S. 152, 165 (1982)); <u>see also</u> <u>Knight</u>, 37 F.3d at 772.

The Government further states that its "position on the truthfulness of Giglio's testimony has not changed since it presented her as a witness at trial." (Opp'n to Mot. 16, ECF No. 265.) Petitioner has presented no evidence that the Government solicited false testimony. Moreover, because the Government did not and does not believe that Giglio's testimony was false, there was no need to correct her testimony when it was presented. <u>See</u> <u>Napue</u>, 360 U.S. at 269.

In Ground Eight, the "false pretenses" asserted are attributed to Special Agent Troiano. (Mem. 20-25, ECF No. 258-2.) The "partial, edited, corrupted and fabricated evidence" refers to the hotel records from the Crosslands Economy Studios presented by the hotel's general manager. (<u>Id.</u> at 20-23; Mot. Ex. G, ECF No. 258-11.)

Both men were called as rebuttal witnesses in response to Petitioner's alibi defense. (Mem. 20, ECF No. 258-2.) Petitioner implies, but provides no evidentiary support for, a sinister motive on the part of these witnesses:

> In response to [Petitioner's] affirmation that he was
> not in Rhode Island, on the day of the robbery of D&B
> Guns, but in fact, was in Tucson, Arizona, agent

24

> Troiano went to Tucson, AZ, to, as he testified,
> substantiate that alibi.  Troiano solicited the
> cooperation of . . . a manager at the 'CrossLand
> Economy Studios #979,' one of the hotels [Petitioner]
> stayed in while in Tucson; and that he testified, to
> his belief and recollection, was the hotel he was
> staying in during the month of September 2000.  What
> transpired (between Troiano and [the manager]) at that
> hotel, and later presented at trial marked the
> precipitation of what resulted in the deprivation of
> [Petitioner's] liberty in contravention of
> constitutional/lawful due process.

(Id.)  Petitioner alleges that the hotel records are "partial,
edited, and ultimately corrupted by Troiano and [the hotel
manager]." (Id. at 21.)  According to Petitioner, the hotel
manager's "testimony admits fabrication and tampering of the
guest folio records," apparently based on the hotel manager's
testimony regarding the manner of retrieving the "Guest Folio"
and the lack of uniformity of the pages. (Id. at 22-23).
Finally, Petitioner claims that Special Agent Troiano, "through
his pretensions at trial, deceived the court and jury; and
through his acts/omissions (has) poisoned the water of Justice,
and caused the wrongful conviction of an innocent man." [12] (Id.
at 25.)

---

[12]  Petitioner states that "suspicion of possible
malfeasance" prompted his family to hire a private investigator,
Martin D. Yant, after trial. (Mem. 23, ECF No. 258-2.)  In a
September 26, 2005, letter to Petitioner, Yant reveals that he
uncovered a Pima County Sheriff's Department report "that seems
to back your claim that you did not leave room #319 at Crossland
Economy Lodging on September 13, 2000, as motel records

While it may be true that the records "don't constitute the complete 'Guest Folio'" and that the hotel manager's testimony regarding how he retrieved the information was inconsistent, there is no evidence that the Guest Folio was edited, corrupted, or alter[ed] in any way. (<u>Id.</u> at 21-22).   Nor is there any evidence whatsoever of any collusion between the hotel manager and Special Agent Troiano.

As part of his Memorandum in support of his Motion, Petitioner swore, under penalty of perjury, that:

> 1.  Following my arrest in the Bronx, New York, in July 2004, ATF Agent Ed Troiano asked me certain questions about my appearance, and made an astonishing revelation and proposition to me regarding the instant case.   Troiano asked me when did I cut my dreadlocks, before or after leaving Arizona; and how did I know to elude him in Tucson and Miami.

---

indicate." (Mot. Ex. H, ECF No. 258-12 (underlining omitted).) The report, which Yant attached to his letter, involved an investigation on September 13, 2000, of a complaint of marijuana use. (<u>Id.</u>)   According to Yant:

> The most important words in this report are in the last paragraph, where management tells the deputy that it wouldn't evict you as long as you "keep your nose clean."   Give[n] the lateness of the incident and management's statement you could stay in room #319, it is unlikely that you would check out, as motel records presented at court indicated.

(<u>Id.</u>)   The most this letter offers is speculation, as evidenced by the wording "seems to back your claim" and "it is unlikely." (<u>Id.</u>)   It hardly indicates malfeasance on the part of either Special Agent Troiano or the hotel manager.

2.   Troiano told me he had been investigating and
pursuing me since I was in Tucson, Arizona, and then
admitted to me that he knows I didn't commit the
robbery; that he knows I wasn't there at the store on
September 25, 2000, or in Rhode Island.   Troinao then
made a proposition stating: "I'll make you a deal.
Tell me what you know about the pending charge in
Massachusetts.[13]   If I can't get you on that I'll get
you on this, and believe me, I will make these charges
stick, and you'll never see your kids grow.

. . .

(Id. at 24.)   Other than Petitioner's sworn statement, there is

absolutely no evidence in the record to support Special Agent

Troiano's purported admission or proposition. See United States

v. McGill, 11 F.3d 223, 226 (1st Cir. 1993) (noting that a

"§ 2255 motion may be denied without a hearing as to those

allegations which, if accepted as true, entitle the movant to no

relief, or which need not be accepted as true because they state

conclusions instead of facts, contradict the record, or are

inherently incredible") (internal quotations omitted).

Similarly, Petitioner can point to no evidence to

substantiate his allegation that Special Agent Troiano "simply

did not want the truth to be revealed—what his investigation in

pursuit of Petitioner had unveiled, i.e., that [he] did not

commit the robbery; that he was in Tucson, Arizona, the whole

---

[13] Petitioner and his brother Nickoyan were charged with the
murder of another brother, Tasfa, in Massachusetts.
(Resentencing Tr. 23; see also Wallace II, 573 F.3d at 86 n.3.)
The jury was not aware of this information.

time; that he is factually innocent!!" (Mem. at 24, ECF No. 258-2) (emphasis omitted).)

The Court details these allegations in consideration of the Government's position that they are "baseless." (Opp'n to Mot. 17, ECF No. 265.)  With the exception of the sworn statement quoted above, Petitioner provides no evidence to corroborate his claims that false testimony and corrupt or fabricated evidence were presented at trial.  The Court rejects these bald allegations.  See Dure, 127 F. Supp. 2d at 279 ("Conclusory allegations or factual assertions that are unsupported, fanciful or contradicted by the record, are insufficient.") (citing Lema, 987 F.2d at 51-52); Barrett v. United States, 965 F.2d 1184, 1186 (1st Cir. 1992)).

The Court finds that Petitioner's rights to due process were not violated at his trial based on the allegations contained in Grounds Five and Eight of the Motion.  Given the lack of any due process violation, there was nothing to raise at trial, defeating any implication of ineffective assistance of counsel.  See Vieux, 184 F.3d at 64 (noting that "failing to pursue a futile tactic does not amount to constitutional ineffectiveness"); see also Knight v. Spencer, 447 F.3d 6, 16 (1st Cir. 2006).

28

4.   Ground Seven

Ground Seven involves allegations that the Government withheld certain evidence material to Petitioner's defense, in violation of his right to due process.[14] (Mem. 17, ECF No. 258-2.)  Specifically, Petitioner claims in Ground Seven that:

> [T]he Government denied [him] due process by suppressing 'Brady' and 'Giglio' material, i.e., investigation reports of the interview of one Shawanda [], the friend of [Petitioner] and his cousin, whose home they frequented in Tucson, Arizona; and who also rented hotel rooms for them; the reports of the arrest and interrogation of [Petitioner's] cousin (James C. Coleman) during the execution [of] the fugitive warrant (for [Petitioner]) at an apartment complex in Miami, Florida; the reports of the interview conducted at TLC Towing in Tucson, Arizona, and the receipt for the drop-off/pick-up of [Petitioner's] vehicles.

(Id.)

It is well settled that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

---

[14] Petitioner does not allege ineffective assistance of counsel as a separate claim for relief in Ground Seven, but he argues that the Government's acts or omissions "prejudiced him by impeding his counsel's ability to render effective assistance." (Mem. 19, ECF No. 258-2.)  In his response to the Government's opposition he refers to "IAC" in the subheading to his discussion of Ground Seven, although without specific argument regarding ineffective assistance of counsel. (Resp. to Opp'n 11, ECF No. 267.)  See n.8, supra.

prosecution." <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).   In addition,

> [T]he duty to disclose such evidence is applicable even though there has been no request by the accused, and th[is] duty encompasses impeachment evidence as well as exculpatory evidence.   Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Moreover, the rule encompasses evidence known only to police investigators and not to the prosecutor.   In order to comply with <u>Brady</u>, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case, including the police.

<u>Strickler v. Greene</u>, 527 U.S. 263, 280-81 (1999) (internal citations and quotations omitted).[15]   "To establish a <u>Brady</u> violation, a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)." <u>Conley v. United States</u>, 415 F.3d 183, 188 (1st Cir. 2005) (citing <u>Strickler</u>, 527 U.S. at 281-82).

---

[15]   In addition, evidence that a promise made to the Government's key witness that he would not be prosecuted if he testified for the Government is relevant to his credibility and the jury is entitled to know it. <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972).

The Government's response to Petitioner's claim included that:

> [t]he reports to which Wallace refers solely concern the agents' attempt to locate Wallace while he was a fugitive from justice.  During the four years after Wallace committed the instant offense, agents spoke to numerous individuals in an attempt to determine his whereabouts.  The reports of these interviews (numbering about 20) have absolutely nothing to do with the facts of the case and need not have been disclosed to the defendant.  Moreover, there was no <u>Brady</u> material whatsoever in these interview reports. The reports confirmed the timeline presented by the Government at trial; that is, that Wallace stayed in Arizona until the middle of September 2000, that he went to Rhode Island thereafter, and that he returned to Arizona after the robbery.  As the interview reports are unrelated to the case under indictment and do not contain any <u>Brady</u> material, there was no error in failing to disclose them to the defense.

(Opp'n to Mot. 15-16, ECF No. 265.)

This excerpt demonstrates the Government's concession that the reports were withheld from the defense.  Therefore, Petitioner has established the suppression component of a <u>Brady</u> violation. <u>See</u> <u>Conley</u>, 415 F.3d at 188.

The Petitioner has failed, however, to show how the interview reports could have been favorable to his defense. Presumably, his argument is that the reports of interviews with Shawanda and James would corroborate his alibi, thereby rendering them exculpatory. (Mem. 18-19, ECF No. 258-2.)  With respect to the report and receipts from TLC Towing, Petitioner

appears to imply that they could have been used to impeach Special Agent Troiano. (Id. at 19.) Even if the Court assumes without deciding that the receipts and interview reports were somehow favorable to Petitioner, see Conley, 415 F.3d at 188, he has not demonstrated that the reports were material to his defense. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). The Court likened the materiality standard to the holding in Strickland that "a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quoting Strickland, 446 U.S. at 694).

With respect to both Shawanda and Petitioner's cousin, James Coleman, Petitioner states that the Government's "'disclosure failure' here impeded counsel's ability to d[i]scover a crucial exculpatory witness, thereby crippling his ability to render effective assistance." (Mem. 18, ECF No. 258-2.) Petitioner's argument is disingenuous.

First, Petitioner's own words corroborate the Government's position that the reports "solely concern the agents' attempt to locate Wallace while he was a fugitive from justice," for the four years "after Wallace committed the instant offense . . . ." (Opp'n to Mem. 15, ECF No. 265 (emphasis added).) Petitioner states that "ATF agent Ed Troiano (and company), in pursuit of [Petitioner], interviewed several individuals in Tucson, Arizona, and arrested and interrogated one individual who was/is significantly crucial to [Petitioner's] case." (Mem. 17, ECF No. 258-2.) He further states that "Government agents pursued [him] in Tucson, Arizona" and "further pursued [him] in Miami, Florida . . . ." (Id. at 17, 18). Such pursuit could only have occurred after the robbery. Petitioner's location after the robbery is immaterial to where he was at the time of the robbery. The reports, therefore, cannot be described as "exculpatory" or "impeachment" evidence and cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).

Second, Petitioner clearly was aware of Shawanda and James. Again his own assertions undermine his argument. Petitioner states that Shawanda was "an associate of [his] and his cousin['s], whose home they frequented on a daily basis

33

during the months they were in Arizona, before leaving for Miami, Florida; who also rented hotel rooms in her name and cosigned for a storage facility . . . ." (Mem. 18, ECF No. 258-2.)  James, Petitioner's cousin, was "the one person that was travelling with him since leaving Providence, R.I., for Tucson, AZ, and then Miami, Fla., before being arrested." (Id. at 18-19.)  That the Government "failed to disclose any information about Shawanda" did not "impede[] counsel's ability to d[i]scover a crucial exculpatory witness . . . ." (Id. at 18.) Moreover, especially with respect to James, who was arrested during an attempted arrest of Petitioner at an apartment complex in Miami, "interrogated on [Petitioner's] whereabouts and . . . was turned over to Immigration Authorities and was subsequently deported to Jamaica," the interviews had to have post-dated the robbery. (Id.)

Lastly, the Court finds it difficult to fathom how the reports and receipt from TLC Towing are material to Petitioner's defense.  Special Agent Troiano testified that he went to TLC Towing in Tucson to determine whether the Land Rover was delivered and picked up in Arizona, and, after speaking with the owner of the tow yard, learned that the vehicle had been picked up on October 9, 2000. (Trial Tr., Vol. 3 17-18.)  Petitioner testified that he "receive[d]" the Land Rover in Tucson.  (Trial

34

Tr., Vol. 2 62.)[16]    Thus, there appears to be no dispute regarding who picked up the Land Rover or when.  That Petitioner was in Tucson on October 9, 2000, has no bearing on where he was on September 25, 2000.

Clearly the agents' reports are not material to Petitioner's defense, as they post-date the time frame of the robbery.  Shawanda's and James's identities were known to Petitioner, and he did not and does not dispute that he retrieved the Land Rover from TLC Towing.  Petitioner has not demonstrated a reasonable probability that the disclosure of the agents' reports or TLC Towing receipt would have resulted in a different outcome of his trial.  See Bagley, 473 U.S. at 682.  In addition, because no Brady violation exists, trial counsel was not ineffective for failing to raise these issues.  See Strickland, 466 U.S. at 694.

    5.  Grounds Ten and Eleven

Both Grounds Ten and Eleven involve allegations of due process violations and ineffective assistance of counsel relating to Mr. DiBiasio's eyewitness identification of Petitioner.  In Ground Ten, Petitioner claims that:

[T]he Government denied [him] due process in charging and convicting him on the basis of a mistaken

---

[16] Petitioner testified that he also picked up a Volkswagen van which was shipped to him in Arizona. (Trial Tr., Vol. 2 61.)

> identification which resulted from an identification
> procedure that was impermissibly suggestive; and
> counsel was ineffective for failing to challenge its
> admissibility on said grounds; and for failing to
> secure and present [his] alibi evidence to prove the
> identification was "mistaken" and the identification
> procedure "suggestive"; and for failing to request a
> model jury instruction on the possibility of "mistaken
> identification."

(Mem. 27, ECF No. 258-2.)  In Ground Eleven, Petitioner alleges

that:

> [T]he Government denied [him] due process by
> suppressing 'Brady/Jencks Act' materials that were
> material to the issue of identification, i.e., the
> reports of Dibiasio's [sic] description of his
> assailant to the police, and the 'photo-array' from
> which he picked out [Petitioner] as the offender; and
> Counsel was ineffective for failing to make specific
> requests for said materials from the Government and/or
> motion the Court to compel compliance in accordance
> with Constitutional/legal mandates.

(Mem. 31, ECF No. 258-3.)

Petitioner's argument regarding Ground Ten is that the

photo array from which Mr. DiBiasio identified him was tainted

by constructive and direct suggestiveness; "constructive in

terms of the 'photo-array's' composition, and direct in terms of

actual indication towards [Petitioner's] photo as the person

under suspicion."  (Mem. 27-28, ECF No. 258-2.)  Petitioner

complains that the photo array included head shots only, that

all photos were black and white, and that all photos were the

same size except his.  (Id. at 28.)  He further alleges that his

photograph, in addition to being "emphatically larger," was "positioned within the 'array' in a manner which instantly and inextricably commands the attention of the viewer . . . ."[17] (Id.)  Petitioner argues that this suggestiveness resulted in misidentification, which, in turn, led to a mistaken in-court identification. (Id. at 27.)  Petitioner asserts that, because he was in Tucson when the robbery was committed, "it was impossible for the witness to make an accurate, independent and positive identification (of [Petitioner] as the second robber) without the degree of suggestiveness that inhered in the identification procedure, here." (Id. at 28-29.)

The First Circuit has stated that "[w]hen the conviction is 'based on eyewitness identification at trial following a pretrial identification by photograph,' [it] will reverse on a constitutional basis only if the 'very substantial likelihood of misidentification' was 'irreparable,' despite the defendant's opportunity to cross-examine the witness about the accuracy of the identification." United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)); see also Neil v. Biggers, 409 U.S. 188, 198

---

[17] This Court notes that only the size and positioning of Petitioner's photo could conceivably be characterized as "suggestive."  If the photo array "only" included head shots, "all" of which were black and white, then his photo could not have stood out for these reasons.

(1972) ("It is the likelihood of misidentification which violates a defendant's right to due process . . . ."). However, "[a] court must also be mindful that it is only in extraordinary cases that identification evidence should be withheld from the jury." United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003) (quoting United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993)).

With both pretrial identifications and in-court identifications, the Court's analysis consists of two steps: first, the Court looks to see if there was anything impermissibly suggestive about the identification procedure; and second, if the procedure was impermissibly suggestive, whether the identification itself was reliable under the totality of the circumstances. Holliday, 457 F.3d at 125. "A photo array's suggestiveness normally is evaluated by determining whether it so far as practicable include[d] a reasonable number of persons similar to any person then suspected whose likeness is included in the array." Id. at 125-26 (alteration in original) (internal quotation omitted). Reliability is measured using five factors delineated in Biggers: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the

38

witness; and (5) the length of time between the crime and the identification. Henderson, 320 F.3d at 100 (citing Biggers, 409 U.S. at 199-200).   Each case must be considered "on its own facts." Simmons, 390 U.S. at 384.

Petitioner's accomplice and brother, Nickoyan, also claimed that a photo array from which an eyewitness identified him was impermissibly suggestive and improperly influenced her in-court identification of him. Nickoyan Wallace v. United States, 526 F. Supp. 2d 277, 288 (D.R.I. 2007).   The Court denied that claim in part because:

> [Nickoyan] has pointed to no evidence, apart from the relative size of [his] photograph, to show that the photographic array from which [the eye witness] identified [him] before trial was impermissibly suggestive.   The fact that the photos were face-shots only did not render them impermissibly suggestive so as to be objectionable, nor the fact that [Nickoyan] was several years younger with lighter facial hair in his photo.   Similarly, the relative sizes of the photos in the array in and of itself are not sufficient to warrant exclusion of the photo identification.

Id. at 289 (citing Holliday, 457 F.3d at 126).   The same analysis applies to Petitioner's claim.   As noted above, Petitioner complained that the photo array shown to Mr. DiBiasio contained only head shots and that his photo was larger than the others.   Moreover, Petitioner does not dispute that the array included "a reasonable number of persons similar to any person

then suspected whose likeness is included in the array."
Holliday, 457 F.3d at 126 (additional quotation omitted).  The
Court, therefore, finds that the photo array from which Mr.
DiBiasio identified Petitioner was not impermissibly suggestive.

Even if Petitioner had shown that the photo array was
impermissibly suggestive, Petitioner cannot overcome the
reliability prong.  In the denial of Nickoyan Wallace's § 2255
motion, the Court stated that the eyewitness of the robbery had
an:

> undeniably . . . close view of [Nickoyan] during the
> robbery as he spoke to her and then removed items from
> the display case.  She viewed the photo array within
> two weeks after the robbery and did not hesitate in
> picking out his photo or in identifying him at trial.
> Moreover, contrary to [Nickoyan's] contention, [his]
> appearance in the photo was not substantially
> different from [the eye witness's] prior verbal
> description of [him] at the robbery.  As noted above,
> she readily identified [him] in open court.  In
> addition, she was vigorously cross-examined concerning
> her pretrial identification of [Nickoyan] by defense
> counsel.  Thus, there was no "irreparable" likelihood
> of misidentification.

Nickoyan Wallace, 526 F. Supp. 2d at 289 (internal citations
omitted).

Similarly, Mr. DiBiasio was an eyewitness to, and victim
of, the robbery.  He testified that he had a close view of
Petitioner as Petitioner had held him at gunpoint. (Trial Tr.,
Vol. 1 38-39, 48-49.)  Mr. DiBiasio further testified that the

store was well-lit and that his view was not impacted by
incoming sunlight. (Id. at 31, 93.)  He gave the police a verbal
description of Petitioner immediately after the robbery and
positively identified Petitioner from a photo array on October
4, 2000.[18]  (Id. at 51, 70, 109, 111-112.)  He also expressed no
doubt regarding his in-court identification of Petitioner. (Id.
at 49.) As already discussed supra n.9, the Court does not rely

---

[18]  Mr. DiBiasio was shown photo arrays on two separate
occasions. (Trial Tr., Vol. 1 50-51.)  The first was a few days
after the robbery. (Id. at 50.)  On that occasion, Mr. DiBiasio
was unable to positively identify anyone as the man who held him
at gun point. (Id.)  He noted that "a couple of people . . .
could possibly be the person," but he was not sure.  (Id. at 50-
51.)  One of those possibilities was Petitioner's brother Kamal.
(Id. at 168.)  Petitioner's photograph was not included in this
first array. (Id. at 160, 161.)

Providence Police Detective John Murray testified that when
he showed Mr. DiBiasio the second photo array on October 4,
2000, which included Petitioner's photo, Mr. DiBiasio "went
right to him and pointed right at him and said, 'That's the
person that came in with the TEC-9.'" (Id. at 166.)  Asked if
Mr. DiBiasio exhibited any doubt, uncertainty, or equivocation,
Detective Murray responded "[n]one that I saw." (Id.)

While much of "the state of scientific research on
eyewitness identification is unsettled," Nat'l Research Council,
supra, at 104, one of the best practices that has been
identified by the scientific research into the effect that a
variety of factors can have on the accuracy of eyewitness
identifications is that eyewitnesses should be provided with an
opportunity to identify a perpetrator as soon as possible after
the witnessed incident. Simon, supra, at 83. The Court concludes
for several reasons that Mr. DiBiasio's identification is
reliable; a conclusion that is bolstered by the fact that both
photo arrays were shown to the witness within ten days of the
robbery, he did not choose a culprit from the first photo array
that he was shown when Petitioner's photograph was not included,
and he subsequently immediately identified Petitioner from the
second photo array.

solely on Mr. DiBiasio's expression of high confidence in open court regarding his identification of Petitioner. Instead, Mr. DiBiasio's identification of Petitioner as the culprit appears reliable on its face and was procedurally appropriate, but more importantly for purposes of this challenge, it was thoroughly examined during his testimony in open court – both through direct- and cross-examination. During a vigorous cross-examination, defense counsel questioned Mr. DiBiasio at length regarding his age and the fact that he wore glasses (id. at 64-65); his description of the second robber (id. at 84, 92, 95-96); whether he had seen the robber in the store before (id. at 85, 101); how long he was looking at the robber (id. at 90-91); his ability to see the robber's face (id. at 85-86, 91); whether the robber had any distinguishing marks on his face (id. at 92, 96); and the photo arrays (id. at 93-99, 105).

Based on the foregoing, the Court concludes that Mr. DiBiasio's identification of Petitioner, both from the photo array and in court, was reliable. Because the photo array was not impermissibly suggestive and Mr. DiBiasio's identification was reliable, Petitioner's claim of misidentification fails. See Simmons, 390 U.S. at 384 (noting that the danger of conviction based on misidentification of an individual from a photograph "may be substantially lessened by a course of cross-

42

examination at trial which exposes to the jury the method's potential for error"); see also United States v. Maguire, 918 F.2d 254, 264 (1st Cir. 1990) ("If minimal suggestivity exists in pre-trial identification, it may be cured at trial. Cross-examination before a jury can establish reliability of identification . . . .").

Turning to counsel's alleged ineffectiveness, the Court first addresses the alleged failure to challenge the in-court identification based on the purportedly flawed photo array. (Mem. 29, ECF No. 258-2.) The Government argues that "[t]here was no reason whatsoever for counsel to file a frivolous motion to challenge the array. Rather, counsel wisely elected to pursue the misidentification defense through a vigorous cross-examination of DiBiasio." (Opp'n to Mot. 12, ECF No. 265.)

The Government's characterization of defense counsel's cross-examination of Mr. DiBiasio as "vigorous" is accurate. Petitioner's counsel also emphasized the discrepancies between Ms. Gallinelli's and Mr. DiBiasio's descriptions of the second robber during his closing argument. (Trial Tr., Vol. 3 133-35.) During his closing argument, counsel stressed how the descriptions given by both witnesses did not reflect Petitioner's actual appearance, in particular whether he had

dark or light skin or whether he had any distinguishing marks. (Id. at 134-35.)

Petitioner's counsel also pointed out Mr. DiBiasio's testimony that he was both looking at the robber's face and that he "was fixated on the gun." (Id. at 129.)  He further argued:

> What else did Mr. DiBiasio say as he was looking at the robber?  He said, "I was looking for emotion.  I was looking to see what he was going to do next." [The Government] asked him what about trying to make identification.  And Mr. DiBiasio said, "It was the furthest thing from my mind.  I thought I was going to die.  I was so afraid."

(Id. at 131-32.)  Counsel posited that "the fact he was under stressful conditions fearing people were going to get hurt, maybe even killed, fixated on the gun, barrel pointing at you, your ID is not going to be accurate, I submit." (Id. at 132.)

Defense counsel was very careful in how he characterized Mr. DiBiasio's testimony, no doubt recognizing that Mr. DiBiasio was a sympathetic witness.  Counsel stated that he did not "think for one second he came in here and lied.  I think he really believes that Timi Wallace was the guy." (Id. at 130.) Rather, "Mr. DiBiasio was simply mistaken." (Id. at 133.)

Counsel's chosen strategy to extensively cross-examine Mr. DiBiasio rather than challenge the use of the photo array does not constitute ineffective assistance of counsel. See Vieux, 184 F.3d at 64 ("Obviously, counsel's performance was not deficient

if he declined to pursue a futile tactic."). The fact that counsel's cross-examination of Mr. DiBiasio failed to persuade the jury does not render counsel's assistance ineffective per se. Phoenix v. Matesanz, 233 F.3d 77, 84 (1st Cir. 2000) ("The mere fact that [a witness's] cross-examination failed to persuade the jury of [the defendant's] innocence is not enough to establish ineffective assistance.").

Finally, with respect to Ground Ten, Petitioner asserts that his counsel failed to request a model jury instruction on the possibility of misidentification. (Mem. 29, ECF No. 258-2.) He argues that courts have held it "imperative that trial courts include, as a matter of routine, an identification instruction in cases where identification is a major issue." (Id. at 30.) According to Petitioner, "[t]he circumstances of [his] case cried out for such an in[s]truction – but counsel simply gave a deaf ear." (Id.)

The Court charged the jury regarding eyewitness identification testimony as follows:

> Now, in this case you heard eyewitness
> identification testimony. In judging the
> identification testimony of any witness, you should
> consider whether the witness had the ability and an
> adequate opportunity to observe the person who
> committed the crime, whether the witness had an
> adequate opportunity will be affected by many things
> including the length of the observation, the distance
> between the witness and the person observed, the

45

> lighting condition and other factors such as whether the witness knew that person from some prior experience.

(Trial Tr., Vol. 3 162-63.)[19]  Although the Court did not use the term "mistaken identification," the factors the Court listed clearly apply to the accuracy of a witness's identification of an individual, specifically Mr. DiBiasio's identification of Petitioner as the second robber.

This Court again finds the analysis employed in the discussion of Petitioner's accomplice's § 2255 Motion instructive.

> While the First Circuit has not directly addressed the issue, other courts have concluded that counsel's failure to request an instruction regarding mistaken identification does not constitute ineffective assistance. . . .
>
>   Here, counsel's repeated questioning during cross-examination of Donn DiBiasio and Donna Gallinelli regarding their memory of the appearance of the robbers was sufficient to bring the issue of mistaken identification to the jury's attention, and it was clear from closing arguments of both the Government and defense counsel that identification of the robbers was a central issue in the case.  In view of this, together with this Court's instructions to the jury on all issues, [Nickoyan] has not shown that counsel's failure to request an instruction concerning misidentification fell below the standard of reasonable professional conduct.

---

[19]   Earlier in its charge to the jury, the Court had instructed the jurors at length regarding their determination of a witness's credibility and the weight they could give to the testimony of each witness.  (Trial Tr., Vol. 3 158-59.)

Nickoyan Wallace, 526 F. Supp. 2d at 293 (internal citations omitted).

Here, Petitioner's counsel's extensive cross-examination of Mr. DiBiasio and Ms. Gallinelli, as well as of Ms. Giglio, was certainly sufficient to alert the jury to the issue of misidentification. Both the Government and defense noted that the identity of the second robber was the key to the case. (Trial Tr., Vol. 1 25, 27; Trial Tr., Vol. 3 81-82.) The Court instructed the jury on eyewitness identification and credibility. (Trial Tr., Vol. 3 158-59, 162-63.) A decision that an additional instruction was unnecessary was reasonable, given the circumstances outlined above.

Finally, even if counsel had erred in declining to request a model instruction on misidentification, Petitioner has not demonstrated that an additional instruction would have resulted in a reasonable probability that the outcome of the trial would have been different or that confidence in the outcome would have been undermined. See Strickland, 466 U.S. at 694; see also Nickoyan Wallace, 526 F. Supp. 2d at 293 (making same finding with respect to Nickoyan). Therefore, Petitioner has not shown that he was prejudiced by any alleged error and, as a result,

has failed to meet the <u>Strickland</u> standard for ineffective assistance of counsel.[20]

Relatedly, in Ground Eleven Petitioner claims that the Government failed to turn over evidence that was "material to the issue of identification," specifically the reports of Mr. DiBiasio's description of the second robber to the police and the photo array discussed above. (Mem. 31, ECF No. 258-3.) Petitioner argues that "the suppression of those materials prejudiced [him] as it deprived him of evidence which supported his counter-claim of mistaken identification, in violation of his constitutional right to due process." (<u>Id.</u> at 32.) He further alleges that:

> Counsel was ineffective for failing to make the necessary request once he became aware that the government had failed to relinquish them, or to even motion the Court to compel compliance of the government's constitutional and legal duty of disclosure. Counsel knew the nature of the instant case – that identification was the main issue – but simply failed to obtain those pieces of evidence in order to effectuate his representation of [Petitioner] in that regard.

---

[20] Petitioner also argues that "[e]ven more detrimentally prejudicial was counsel's failure to secure/present [his] alibi evidence in order to support his challenge of the identification as having been tainted by the procedure employed by law enforcement officials – and prove that the resulting identification (of [Petitioner] as the culprit) was mistaken (false)." (Mem. 29, ECF No. 258-2.) The Court will address this claim <u>infra</u> in its discussion of Petitioner's overall claim regarding counsel's alleged failure to investigate Petitioner's alibi.

(Id.)

As discussed previously, Brady requires the Government to turn over to the defense any evidence in its possession (or the possession of its agents) which is favorable to the defendant because it is exculpatory or impeaching and material to the issue of guilt or punishment. Strickler, 527 U.S. at 280-81; Conley, 415 F.3d at 189.  The Jencks Act "obliges the Government to hand over, upon request, prior statements of a government witness relating to the witness's trial testimony, whether such statements are exculpatory or not.  A 'statement' for purposes of the Jencks Act includes any written statement made, adopted, or approved by the witness."  United States v. Colon-Diaz, 521 F.3d 29, 38 (1st Cir. 2008) (internal citations omitted); see also 18 U.S.C. § 3500.

It does not appear from the record that the reports and photo array were in the possession of the defense at trial. Therefore, the Court will presume that Petitioner has demonstrated that the items were suppressed.

According to Petitioner, the defense would have used the reports of Mr. DiBiasio's initial description to impeach him regarding his in-court identification of Petitioner as the second robber. (Mem. 31, ECF No. 258-3.)  Petitioner's statement

49

that having the photo array would have "given the defense the ability to expose the suggestiveness, lack of accuracy, independence and reliability in the identification (procedure), in a pre-trial challenge to the admissibility of the identification evidence" is somewhat vague. (Id. at 31-32.) Nonetheless, the Court will assume that both the reports and photo array were favorable to Petitioner as impeachment evidence.

As discussed previously, the standard for determining materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Petitioner's argument regarding the reports rests on the assumption that Mr. DiBiasio's initial description of the second robber to the police was substantially different than his in-court testimony and identification of Petitioner. While there were some discrepancies between Mr. DiBiasio's testimony and Ms. Gallinelli's descriptions of the second robber, as well as between Mr. DiBiasio's testimony and Petitioner's actual appearance, defense counsel exploited those discrepancies both in his cross-examination of Mr. DiBiasio and in his closing argument.

For example, counsel cross-examined Mr. DiBiasio regarding his testimony that he had a clear view of the second robber's face. (Trial Tr., Vol. 1 85, 91-92.)

> Q.   And you said he didn't have any distinguishing marks.
>
> A.   Outside of the mustache, there was [sic] no distinguishing marks.
>
> Q.   All right.  And if he had a distinguishing mark, you would have seen it, fair to say?
>
> A.   Yes.

(Id. at 92.)   On direct examination of Petitioner, however, counsel elicited the fact that he has had a scar above his left eye since childhood. (Trial Tr., Vol. 2 60.)   During closing argument, counsel invited the jurors to look at Petitioner's face when they left the courtroom:

> Mr. DiBiasio claimed that there were no distinguishing marks on the second robber's face.  When you leave this courtroom, I want you to look at the left-hand eye of Timi Wallace.  And there is a one-inch gash that is clearly visible.
>   Now, you can't see it from back here, but as you go out the door, you get close enough to the defendant to take a look at it.  Certainly, a distinguishing mark that one would have certainly picked up if you were really staring at someone's face trying to make an identification.

(Trial Tr., Vol. 3 135-36); see also Manon, 608 F.3d at 132-33 (utilizing similar strategy in misidentification defense).

51

This is but one example of defense counsel's use of discrepancies in testimony and actual appearance to Petitioner's advantage. As noted above, the fact that counsel was unsuccessful in impeaching Mr. DiBiasio regarding his identification of Petitioner and establishing reasonable doubt regarding the identity of the second robber in the minds of the jurors does not demonstrate ineffective assistance. See Phoenix, 233 F.3d at 84; Natanel, 938 F.2d at 310. The Court will not second-guess defense counsel's strategy based on an assumption. See Strickland, 466 U.S. at 689 (requiring that "every effort be made to eliminate the distorting effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time").

Second, regarding the photo array, the Court has already rejected Petitioner's argument that it was suggestive and found that Mr. DiBiasio's identification of Petitioner was reliable. In order to determine whether the identification procedure was accurate and independent, the Court looks to the testimony of Detective Murray with respect to the procedures involved in constructing said array and in presenting it to Mr. DiBiasio.

Detective Murray testified that, on the evening of the robbery, he and Detective O'Mara, ATF agents, and Boston Police officers returned to D&B guns with photo spreads. (Trial Tr.,

Vol. 1 159.)   The original photo spread shown to Mr. DiBiasio was compiled by the Boston Police Department. (Id. at 160.) Petitioner's and Nickoyan's photos were not included, as they were not yet suspects in the robbery. (Id.)  Detective Murray described the procedures used to show a witness a photo spread:

> Most of the times we show them a photo instruction sheet, which tells them the person may or may not be in this photo and not to talk, if the person is in the photo just to tell the detective or whoever is handling the case, and not to discuss it with any other witnesses.

(Id.)  According to Detective Murray, both Ms. Gallinelli and Mr. DiBiasio were shown photo spreads that night. (Id. at 160-61.)  Ms. Gallinelli did not identify anyone, and Mr. DiBiasio, as noted previously, did not positively identify anyone. (Id. at 161.)

Detective Murray returned to D & B Guns approximately a week later, on October 4th, with two photo spreads. (Id. at 161, 165.)  He and Detective O'Mara had prepared the spreads, one of which contained a picture of Petitioner and the other a picture of Nickoyan. (Id. at 163-64.)  The photo of Petitioner had been obtained from the Massachusetts Registry of Motor Vehicles. (Id. at 164.)  Both photo arrays were shown to Ms. Gallinelli and Mr. DiBiasio, as Detective Murray testified:

> Q.  Now, when you got to D & B Guns that day on October 4, what procedures did you utilize in

53

showing both Donna Gallinelli and Donn DiBiasio
the photo spreads?

A.   Donna was behind the counter, and Donn was in the
back room.  So they were separate.  And we went
through the same procedure, showed a photo
instruction sheet and showed Donna first the
pictures.

Q.   Were they shown at the same time or separately?

A.   Separately.

Q.   And why is that?

A.   We always separate so they can't -- like one
looking over the other's shoulder and picking
someone out.

(Id. at 164.)  The procedures used in showing Ms. Gallinelli and

Mr. DiBiasio the photo arrays described above were both designed

to—and did—ensure accuracy and independence of the witnesses'

identification of the suspects.

With respect to Petitioner's photo, on cross-examination

his counsel elicited testimony from Detective Murray that the

picture from which Mr. DiBiasio identified Petitioner was five

years old. (Id. at 167.)  Counsel next focused on the first time

Mr. DiBiasio was shown a photo spread and his indication of two

possible suspects, one of whom was Petitioner's brother, Kamal.

(Id. at 167-69.)  Lastly, counsel focused on the fact that, when

shown the same photo spread, Ms. Gallinelli did not pick out

Petitioner.  (Id. at 169.)  Counsel reminded the jury of these

points in the course of his closing argument. (Trial Tr., Vol. 3 136.)

It is clear from this testimony that defense counsel used cross-examination effectively to raise questions about Petitioner's photo and Mr. DiBiasio's identification without relying on the photo array. In addition, as seen above, counsel cross-examined Mr. DiBiasio extensively regarding his identification. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688; see also Spencer, 447 F.3d at 18 (noting "the wide latitude of discretion available to defense counsel to conduct the defense in the manner of his or her own choosing"). The decision to rely on pointed questioning of witnesses, rather than attempting to obtain the photo spread, is a strategic choice which the Court will not question in hindsight. The Court finds that counsel was not ineffective for failing to request or obtain the photo array. See Strickland, 466 U.S. at 699 ("Counsel's strategy choice was well within the range of professional reasonable judgments, and the decision not to seek more . . . than was already in hand was likewise reasonable.").

Even if counsel's reliance on cross-examination rather than seeking the reports and photo array was considered erroneous, Petitioner cannot show that he was prejudiced by such alleged errors. See Strickland, 466 U.S. at 693.  Given the weight of the other evidence against Petitioner, this Court cannot find a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Because Petitioner has not demonstrated prejudice pursuant to Strickland, he has also failed to establish that the evidence he argues counsel should have sought was material under Brady. See Simmons, 390 U.S. at 388-89 (noting that "[a]lthough the pictures might have been of some assistance to the defense . . . the strength of the eyewitness identifications of [the defendant] renders it highly unlikely that nonproduction of the photographs caused him any prejudice"); see also Strickler, 527 U.S. at 290 ("[T]he question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.") (internal quotation omitted).  Accordingly, Ground Eleven provides no basis for relief.

6.   Ground Twelve

In Ground Twelve, Petitioner alleges that the Government violated his right to a fair trial by: "having witnesses in the courtroom while other witnesses testified; making misstatements of facts; making prejudicially improper and inflammatory remarks in closing; and alluding to facts not in evidence." (Addendum to Mot. 1-2, ECF No. 258-1.)  Petitioner also claims that both his trial and appellate counsel were ineffective for failing to raise the alleged prosecutorial misconduct in this Court or on appeal. (Mem. 34-35, ECF No. 258-3.)

Petitioner's claim regarding the presence of witnesses in the courtroom while other witnesses testified is focused primarily—but not exclusively—on the presence of Special Agent Troiano, "a witness who took the stand twice," who sat at the prosecution table throughout the trial. (Id. at 33.)   The Government counters that Special Agent Troiano's presence at the prosecution table was not improper because a case agent who testifies as a witness may remain in the courtroom. (Opp'n to Mot. 16, ECF No. 265.)   Although Petitioner disputes that Agent Troiano was the case agent (Resp. to Opp'n 14, ECF No. 267), the evidence indicates otherwise.

First, the Government introduced Special Agent Troiano at the beginning of the first day of Petitioner's trial as "from

57

the ATF." (Trial Tr., Vol. 1 3.)   Second, Detective Murray of the Providence Police Department testified that, while he was originally the lead detective on the case, his involvement as lead detective ended when ATF took over the investigation. (Id. at 166, 169.)   Third, Agent Troiano testified that he became involved in the investigation on the day of the robbery, although he was not one of the first officers on the scene. (Id. at 186.)

Moreover, it is clear from reading the transcript of his testimony that Agent Troiano testified based on his own investigation of the matter, not on the testimony of any other witness who preceded or followed him. (Id. at 182-213; Trial Tr., Vol. 2 4-24; Trial Tr., Vol. 3 13-35.)

Next, Petitioner states that, "on several occasions there were different witnesses other than Troiano present in the courtroom.   In fact, the court had to address the prosecutor about that on several occasions." (Resp. to Opp'n 14, ECF No. 267.)

Petitioner's first example of a witness other than Special Agent Troiano involves a witness whose presence the Government brought to the Court's attention:

> [THE PROSECUTION]: Your Honor, I just noticed that a Government witness is in the courtroom.   I failed to advise him to stay outside.

> THE COURT:  All right.  Anyone who is a witness
> in this case needs to leave the courtroom.

(Trial Tr., Vol. 2 18.)  There is no indication of the identity

of the witness or the duration of his/her presence, but given

the fact that the situation occurred during the cross-

examination of the first witness of the day, presumably the

unidentified witness was not present very long.

Second, [Petitioner] refers to a witness being in the

courtroom on the third day of trial:

> THE COURT:  Excuse me a minute.  I notice that a
> witness is in the courtroom.  Are you intending to
> call him as a rebuttal witness?
>
> [THE PROSECUTION]:  I am.
>
> THE COURT:  Then I think he needs to leave the
> courtroom.
>
> [THE PROSECUTION]:  Yes, your Honor.  I apologize
> for that.
>
> THE COURT:  It's all right.

(Trial Tr., Vol. 3 16.)  Again the witness is not identified,

nor is a time frame for that witness's presence provided.  These

are the only examples cited by Petitioner, and the Court has

found no other instances recorded in the trial transcript.

Based on the foregoing, it can hardly be said that "the

court had to address the prosecutor about that on several

occasions." (Resp. to Opp'n 14, ECF No. 267.)   Moreover,

Petitioner presents no evidence to corroborate his argument that these witnesses tailored their own testimony in any way to comport with the Government's theory of the case (or with other witnesses' testimony) or "prejudicially undermin[ed] the integrity of the trial process," thereby depriving him of a fair trial. (Mem. 33, ECF No. 258-3.)   There is simply no substance to this allegation.

Nor is there any merit to Petitioner's claims that the Government made "material misstatements of facts; [made] prejudicially improper, inflammatory remarks during closing arguments; and allud[ed] to facts not in evidence." (Id. at 32-33.)   Petitioner elaborates on these claims as relating to, but not limited by, the following: reference to Petitioner's flight as evidence of guilt; incomplete accounts of the eyewitness descriptions of the assailant to the police; references to the Southwest Airlines records as evidence that Petitioner was in Rhode Island in September 2000; use of the check-out date of September 13, 2000, the shipping order for the Land Rover, and Audrey Giglio's testimony as evidence that Petitioner was in Rhode Island on September 14, 2000; and statements that Petitioner had "cased" and "scoped out" D & B Guns based on his testimony that he had been there and purchased a gun in 1997. (Id. at 33-34.)

Little needs to be said regarding the Government's reference to flight in its closing argument. In his first appeal, the First Circuit addressed the Government's reference to Petitioner's flight from Rhode Island. Wallace I, 461 F.3d at 25-26. The court found no error in the prosecutor's remarks.[21] Id. at 26.

Petitioner's other allegations fare no better. With respect to the allegedly "incomplete" descriptions of the second robber that Mr. DiBiasio and Ms. Gallinelli gave to the police, Petitioner contends that the prosecution "was attempting to avoid high-lighting the discrepancies between that description and the defendant's actual description – which are polar opposites." (Mem. 34, ECF No. 258-3.) However, his trial counsel did just that. Counsel made a lengthy argument during his closing that questioned the eyewitness descriptions. (Trial Tr., Vol. 3 129-36.)

---

[21] The Court of Appeals stated that "[a]ny overstatements by the prosecution in its closing were mitigated by the district court's careful instructions that flight did not necessarily reflect a guilty conscience and that the jury 'should consider that there may be reasons for Timi Wallace's actions that are fully consistent with innocence.'" Wallace I, 461 F.3d at 26. The court also stated that, "given the crushing weight of the other evidence against the defendant in this case (including eyewitness identification and the recovery of five of the stolen guns and the weapon allegedly used in the robbery in his apartment), we cannot conclude that any error here affected the defendant's substantial rights." Id.

Regarding Petitioner's claim that the Government used the Southwest Airlines booking records as evidence that he was in Rhode Island during the relevant time, "knowing for a fact that no tickets were purchased in connection with the reservation, and thus no flight taken" (Mem. 34, ECF No. 258-3), the transcript reveals that the Government actually stated: "Now there's no indication he ever went on [the flight].  In fact, Southwest told us his ticket was never entered." (Trial Tr., Vol. 3 108.)  Thus, there was no misstatement of fact relating to the Southwest booking records.  Moreover, during closing argument defense counsel emphasized the lack of information regarding who booked the flight or why, as well as the fact that "[n]obody ever took the plane." (Id. at 143.)

Petitioner also complains about the Government's use of the September 13, 2000 checkout date from the hotel, the shipping order for the Land Rover, and Audrey Giglio's testimony as evidence that Petitioner was in Rhode Island on September 14, 2000, while allegedly "knowing for a fact that, absent any flights, it was impossible to check-out on the 13th and drive from Arizona to Rhode Island by the 14th – before 5 O'clock . . . ." (Mem. 34, ECF No. 258-3.)  The Government's closing argument was based on the evidence and testimony it presented at trial to support its version of events leading up to the robbery

and to discredit Petitioner's alibi. (Trial Tr., Vol. 3 111-13.) Defense counsel countered by using Petitioner's testimony, as well as cross-examination of Government witnesses, to undermine the Government's account and to emphasize Petitioner's alibi that he was in Arizona at the time of the robbery. (Id. at 140- 43.) The fact that the Government and defense had different theories of the case, presented conflicting evidence to bolster their respective interpretations, and used that evidence in their closing arguments does not render the Government's statements in closing "misstatements of facts."

Finally, the Government's use of Petitioner's testimony that he had been to D & B Guns and purchased a gun in 1997 to state that Petitioner had "cased the store" and "scoped out the store" (Mem. 34, ECF No. 258-3) represents the Government's inference based on his testimony, not a misstatement of fact, reference to facts not in evidence, or improper remarks. Defense counsel addressed the Government's argument regarding Petitioner's 1997 visits to the store and asked the jury to reject it. (Trial Tr., Vol. 3 142.)

The Court has reviewed the Government's closing and rebuttal arguments, as well as the defense's closing. Each side gave its version of events based on the evidence and testimony it presented. Nothing improper was said. Therefore,

Petitioner's due process rights were not violated, and trial counsel was not ineffective for failing to object to these parts of the Government's closing argument.   Nor was appellate counsel ineffective for failing to raise prosecutorial misconduct as an issue on appeal. See Vieux, 184 F.3d at 64; Dure, 127 F. Supp. 2d at 280.   Accordingly, this ground for relief is rejected.

### 7.   Grounds Six, Nine, and Thirteen[22]

The majority of Petitioner's ineffective assistance of counsel claims fall into two categories: counsel's alleged failure to investigate evidence that, in Petitioner's view, would have supported his alibi; and counsel's alleged failure to interview family members for alibi purposes.   Petitioner argues that:

> The fact that [his] alibi of being in Arizona (when the robbery was committed), was essentially his true affirmative defense (in response to the Government's accusations) raises the degree of necessity for such investigative measures by counsel in order to discover evidence which substantiates his client's claims, be it through objects, places, or persons.

(Mem. 26-27, ECF No. 258-2.)

Ground Six cites counsel's "failure to investigate alibi and interview family for defense witness purposes." (Addendum to

---

[22] As previously stated, the Court will also address in this section the portions of Grounds Four and Ten which raise similar allegations.

Mot. 1, ECF No. 258-2.)   The same is true for Ground Nine.[23]

(Id.)   In Ground Thirteen, Petitioner asserts that counsel "failed to make the necessary investigations into mitigating/exculpatory evidence, i.e., traffic tickets, locations, surveillance footages from Tucson, AZ, and other matters." (Id. at 2.)   Ground Thirteen also alleges that counsel was ineffective by "failing to sufficiently meet with [Petitioner] and make himself accessible for collaborative purposes in structuring his defense; and for making improper and prejudicial remarks in closing arguments." (Mem. 35, ECF No. 258-3.)   The Court will address this portion of Ground Thirteen separately.

In addition, as part of Ground Four, Petitioner alleges that counsel was ineffective for "failing to make the necessary

---

[23] In Ground Nine, Petitioner alleges that trial counsel told him that he would undertake an investigation, but did not do so. (Mem. 25, ECF No. 258-2.)   Even assuming counsel misspoke, however, given the weight of the evidence discrediting Petitioner's alibi and the fact that the private investigator hired by Petitioner found only the Pima County Sheriff's report described earlier, it is doubtful that such investigation would have changed the outcome of the proceedings. See Strickland, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

The Court does not find this dispute sufficient to warrant an evidentiary hearing. See n.1, supra.   Moreover, as will be discussed infra, Petitioner has not demonstrated that he was prejudiced by counsel's failure to send an investigator to Arizona.

investigations into [his] alibi whereabouts in Tucson, AZ, in order to produce evidence at trial to affirmatively rebut the Government's position/use of the flight reservation records." (Mot. 8, ECF No. 258.) In Ground Ten, Petitioner claims that counsel provided ineffective assistance for "failing to secure and present [Petitioner's] alibi evidence to prove the identification was 'mistaken' and the identification procedure 'suggestive.'" (Mem. 27, ECF No. 258-2; see also Addendum to Mot. 1, ECF No. 258-1.)

First, with respect to Petitioner's failure to investigate claims, Strickland instructs that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. According to Petitioner, counsel assured him that he could not be found guilty because he is not "a 'very dark' black male" (Mem. 37, ECF No. 258-3) as he had been described by Ms. Gallinelli (Trial Tr., Vol. 1 149-50), indicating counsel's

intention to rely on a misidentification defense.   This is
reflected in the trial transcript.   In his closing argument,
counsel stated that: "Timi Wallace is hardly a very black, dark
male.   You can even look around the courtroom, and you can see
the distinction in color between a very dark, black male and
another gentleman who has what I consider a light skin." (Trial
Tr., Vol. 3 134.) Cf. Lema, 987 F.2d at 54 ("Where the
prosecution's case is less than compelling, as [counsel]
represented to [defendant] during trial, the risk of 'rocking
the boat' may warrant a decision by trial counsel to forego the
presentation of further defense testimony, even favorable
testimony.").

Moreover, it is clear from a reading of the trial
transcript that counsel's strategy was to rely primarily on
cross-examination of the Government's witnesses to discredit
their testimony and create reasonable doubt in the minds of the
jurors.   Counsel also sought to cast suspicion on Kamal as the
second robber.[24]   Petitioner argues that "[t]he failure to
investigate and secure evidence which, in this case, included
but was not limited to video surveillance footage(s) of claimant
at [a] location(s) in Arizona on the day of the robbery, cannot

---

[24]   In addition, counsel incorporated Petitioner's alibi
defense through his cross-examination of Government witnesses as
well as his testimony.

67

be considered sound trial strategy or reasonable assistance – under these circumstances." (Resp. to Opp'n 5, ECF No. 267 (alteration in original).) The Court disagrees.

For example, with respect to the flight reservation records (Ground Four), as discussed previously, counsel focused his cross-examination of Special Agent Troiano on the fact that there was no evidence, other than the name Devon Lewis (Petitioner's alias) linking him to the reservation. (Trial Tr., Vol. 3 31-33.) Special Agent Troiano could not identify the individual who made the reservation, nor, he testified, could anyone at the travel agency through which the reservation was made. (Id. at 31, 34-35.)

As for misidentification (Ground Ten), Mr. DiBiasio testified on cross-examination that he did not see any distinguishing marks on the second robber's face (Trial Tr., Vol. 1 92, 96), whereas, as counsel pointed out, Petitioner had a scar over his left eye (Trial Tr., Vol. 2 60), a discrepancy counsel emphasized during his closing argument (Trial Tr., Vol. 3 135). Defense counsel also cross-examined Mr. DiBiasio at length regarding his ability to identify Petitioner. (Trial Tr., Vol. 1 64-65, 84-85, 90-99, 114.) Mr. DiBiasio admitted that "[t]he fact that [he] would have to identify was not the main reason that [he] was looking at his face." (Id. at 114.) In

68

addition, the first time he was shown a photo array, Mr. DiBiasio identified two black males, neither of whom was Petitioner, as possible suspects. (Id. at 94-95; Trial Tr., Vol. 2 6.)  Counsel's cross-examination of Ms. Gallinelli highlighted the discrepancies between her description of the second robber and Mr. DiBiasio's. (Trial Tr., Vol. 1 142-43, 148-51).  Ms. Gallinelli, as noted above, described the second robber as a "[v]ery dark, black male." (Trial Tr., Vol. 1 143, 149-50.)  Ms. Gallinelli also testified that she was never able to pick out a picture of Petitioner. (Id. at 150.)  The latter testimony was echoed by Detective Murray. (Id. at 159-61, 165.)

Other examples of counsel's use of cross-examination of the Government's witnesses to undermine their testimony abound, several of which have been mentioned above.  Special Agent Troiano testified that neither the Government nor ATF undertook any efforts, such as handwriting analysis[25], to determine whether the "[S]hipper's [S]ignature" on the East Coast Auto shipping form was Petitioner's. (Trial Tr., Vol. 3 30-31.)  The Arizona

---

[25] Handwriting analysis is a form of forensic science that the National Research Council has deemed in need of additional research to quantify the reliability and replicability of the methods employed by document examiners. Nat'l Research Council, The Nat'l Academies, Strengthening Forensic Science in the United States: A Path Forward 166-67 (2009).  Had the government performed any type of document analysis, it is likely that the results would not have been given much weight in the consideration of Petitioner's arguments.

hotel manager did not know whether a "Devon Lewis" was ever physically at Crossland Economy Studios, or know if he was traveling with anyone. (Trial Tr., Vol. 3 41.)   When questioned about the "fast" check of the hotel records and what names turned up, the manager was unsure whether the first name "Chris" or "James" came up when he checked for "Coleman;" nor did he remember checking any other names until prompted. (Id. at 43-45.)   The manager acknowledged that, during the half hour he was checking records for Special Agent Troiano, he only produced two documents. (Id. at 45.)   These are but two examples of counsel's strategic use of cross-examination to attempt to establish reasonable doubt.

Petitioner's counsel also proffered an alternative suspect, Petitioner's brother Kamal.   For example, on cross-examination Detective Murray testified that one of the photos Mr. DiBiasio picked out of the first photo array was of Kamal. (Trial Tr., Vol. 1 168.)   Special Agent Troiano was questioned about Kamal's driver's licence photo, which was taken when he was seventeen years old. (Trial Tr., Vol. 2 19.)   Kamal was twenty-one years old at the time of the robbery. (Id.)   Ms. Gallinelli had described the second suspect as "younger than the other" and stated that "[h]e could have been a juvenile." (Trial Tr., Vol. 1 149.)   After Special Agent Troiano testified on direct

examination that the sixth stolen weapon was found in Kamal's apartment (Trial Tr., Vol. 1 213), counsel elicited testimony that the gun was Kamal's (Trial Tr., Vol. 2 10).  During his closing argument, counsel argued that the cell phone records indicated that Kamal was in touch with Nickoyan just before the robbery; that Kamal had a gun from the robbery at his house; that Kamal was picked out by Mr. DiBiasio as a possibility; that Kamal was a very dark-skinned black male, consistent with Ms. Gallinelli's description of the second robber, and that Kamal was younger than Nickoyan, also consistent with Ms. Gallinelli's description. (Trial Tr., Vol. 3 127-28, 131, 134, 137-38, 144.)

While counsel's trial tactics may appear dubious to Petitioner in hindsight, especially given the guilty verdict, "the reviewing court must be persuaded that the failed trial strategy was not within the 'wide range of reasonable professional assistance' contemplated by Strickland." Lema, 987 F.2d at 56.  This Court is not persuaded that counsel's failure to introduce certain evidence "was beyond Strickland's pale." See id.

Next, turning to counsel's alleged failure to interview Petitioner's family members, Petitioner specifically names his cousin, James Coleman (also known as Damion Burke), his brother Ojomo, and his uncle, Keith Wallace.  Petitioner states that he

71

"had informed counsel that he and [Coleman] were travelling together from the time they left Providence, RI, (for Tucson, AZ) . . . ." (Mem. 12, ECF No. 258-2.)  According to Petitioner, Coleman "more than anyone else could substantiate/corroborate [his] alibi." (Resp. to Opp'n 12, ECF No. 267.)  With respect to Ojomo and his uncle, Petitioner argues:

> Even more prejudicially deficient was counsel's failure to interview [his] family in order to ascertain whether it was in fact his brother Ojomo Wallace or his uncle Keith Wallace who had dropped off the vehicle on September 14, 2000, for a defense witness to that fact, and that Petitioner was in Arizona . . . not Rhode Island.

(Mem. 16, ECF No. 258-2 (ellipsis in original).)  Petitioner further states that he "had informed counsel that he had spoken to both family members asking either of them to get the money from Nick, drop off and pay for the vehicle to be shipped." (Id.)

In Lema, the First Circuit addressed a similar ineffective assistance claim.  Lema asserted that his counsel neither interviewed nor presented three potential defense witnesses he had proposed as able to support his alibi, therefore depriving him of a "viable defense." 987 F.2d at 54 (internal citation omitted).  The district court's denial of the claim was affirmed by the First Circuit in part because "[t]he decision whether to call a particular witness is almost always strategic, requiring

72

a balancing of the benefits and risks of the anticipated testimony." Id.; see also Phoenix, 233 F.3d at 82 (quoting Strickland, 466 U.S. at 690) (observing that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Given defense counsel's rigorous cross-examinations of the Government's witnesses, the strategic decision not to present these witnesses does not indicate ineffective assistance. See Lema, 987 F.2d at 55. "Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence." Id. at 54; see also Manon, 608 F.3d at 132 ("Although [defense counsel] did not put on witnesses of his own, he vigorously cross-examined each of the government's witnesses.").

Petitioner argues that the problem also lies in his counsel's decision not to investigate the potential testimony. The First Circuit has been clear, however, that:

> The decision to interview potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case. In view of the . . . benefits

73

> and risks which would have been readily apparent to experienced trial counsel without conducting an interview or further investigation . . . [counsel's] failure to interview the proposed witnesses did not amount to ineffective assistance in the constitutional sense.

Id. at 55; see also Cepolonis v. Ponte, 699 F.2d 573, 575 (1st Cir. 1983) ("[C]ounsel need not chase wild factual geese when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial as a matter of law . . . .").

Even if Petitioner could meet the first prong of the Strickland test, he has not shown that any alleged errors on counsel's part prejudiced him. See 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). This Court disagrees with Petitioner and finds that counsel subjected the Government's case to meaningful adversarial testing. The fact that counsel's strategy was unsuccessful does not render such strategy unreasonable or counsel ineffective. See Natanel, 938 F.2d at 310; see also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

Petitioner's allegations that counsel failed to meet with him or make himself sufficiently available to structure a defense, and that he made prejudicial remarks during his defense's closing argument, fare no better. (Mem. 37, 38, ECF No. 258-3.) Counsel's conduct is judged by "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. The Supreme Court declined to set more specific guidelines. Id. at 688-89.

The remarks that Petitioner claims were prejudicial include counsel's reference to Nickoyan as the first robber (Mem. 38, ECF No. 258-3), and his statement regarding Mr. DiBiasio that: "You know, ladies and gentlemen, I don't think for one second that he . . . came in here and lied" (id. at 39). With respect to the first statement, Nickoyan had already been convicted of the robbery, a fact which was reflected in the testimony of numerous witnesses. Moreover, Nickoyan's conviction did not necessarily implicate Petitioner as the second robber. In fact, counsel suggested Kamal as an alternative suspect to the jury. (Trial Tr., Vol. 3 127-28, 131, 134, 137-38, 144.) Regarding counsel's comment about Mr. DiBiasio, Petitioner argues that "[t]he nature of the case did not warrant such a remark which tended to lead the jury to believe counsel himself personally believed the witness was credible – especially here where the

75

defense is claiming a mistaken identification." (Mem. 39, ECF No. 258-3.) The comment, however, must be considered in its context. Counsel was suggesting to the jury that Mr. DiBiasio was mistaken, not deliberately lying. Moreover, the decision as to how to handle the testimony of the victim of the robbery who feared for his life, clearly a sympathetic witness in the jury's eyes, was a strategic one, and a sensible approach. Neither statement can be considered improper to the level of ineffective assistance of counsel.

Considering all of the circumstances, Petitioner has not demonstrated that counsel's assistance was unreasonable. See Strickland, 466 U.S. at 688. Nor has he shown that he was prejudiced by counsel's performance in that he was deprived of a fair trial due to counsel's alleged errors. See id. at 687. Accordingly, Petitioner's ineffective assistance of counsel claims are rejected in their entirety.

8.   Ground Fourteen

Petitioner asserts in Ground Fourteen that "[t]he court lacked jurisdiction over the case as Dibiasio [sic] was not a federally licensed dealer at the time of the robbery." (Addendum to Mot. 2, ECF No. 258-1.) He further alleges that the Court was "misled by misrepresentations of facts and false presentations at trial," presumably related to the above issue,

and that counsel was ineffective in failing to notice and timely raise this issue. (Id.)  In essence, Petitioner argues that, at the time of the robbery, Mr. DiBiasio's license had lapsed and had not been renewed for this period. (Mem. 40, ECF No. 258-3.) He has included exhibits from the ATF which purportedly support his claim. (Mot. Ex. L.)[26]

During Petitioner's trial, Mr. DiBiasio testified that he had a federal license to sell firearms during the period including September 25, 2000. (Trial Tr., Vol. 1 29-30.) Special Agent Troiano testified that the ATF maintained records, stored at the Federal Licensing Center in Atlanta, Georgia, on who was licensed to sell firearms. (Id. at 185.)  He was questioned about his inquiry regarding Mr. DiBiasio's status:

> Q.   I'd like to show you Government Exhibit 13.  What is Exhibit 13?
>
> A.   It's a what [sic] we call a blue ribbon certification for a federal firearms license.
>
> Q.   Now, referring to page two of this certification, just generally, what does it provide?

---

[26]   Petitioner states that he obtained these documents through a Freedom of Information Act request made on April 6, 2010. (Mot. Ex. L.)  Many of the documents in this exhibit are difficult, if not impossible, to read.  Within this exhibit, Petitioner has also included a record from the city of Providence, Rhode Island, regarding DiBiasio's license to sell firearms in the city. (Id. at 20; see also Mot. Ex. M-1, ECF No. 258-16.)  This portion of the exhibit is wholly irrelevant to the issue of whether federal jurisdiction existed.

> A.   It provides that DB Guns was a licensed federal
>      firearms dealer for the time period of January
>      1st, 1990 through January 1st, 2001.
>
> Q.   Does that mean that Mr. DiBiasio wasn't a
>      licensed dealer before or after that period?
>
> A.   No, sir.  It's usually required when you make a
>      request for certification to furnish them with a
>      specific time period that you would like
>      verified.

(Id. at 186.)

In his response to the Government's objection, Petitioner states that "[t]here appears to be some controversy between the 'Blue Ribbon' certification [the exhibit discussed in the trial testimony] and the records [Petitioner] received from the federal licensing center in Atlanta, GA, which indicates that Mr. Dibiasio was not 'federally licensed' in September 2000." (Resp. to Opp'n 11, ECF No. 267.)  However, Petitioner provides no affirmative evidence to support this statement.  Rather, he relies on the absence of evidence to prove the negative, stating that "[n]o records exist which demonstrates that Dibiasio [sic] was licensed for the February 2000 through February 2001 tenure; they reflect this void from Feb. 1, 1999 to Feb. 1, 2001." (Mem. 40, ECF No. 258-3 (internal citations omitted).)

With respect to Petitioner's assertion that the Court was misled by factual misrepresentations and false presentations at

78

trial, apparently referring to the "Blue Ribbon certification" and testimony from Mr. DiBiasio and Special Agent Troiano, the Court is not persuaded. The Court finds that Mr. DiBiasio was a federally licensed gun dealer during the relevant period, and that this Court exercised proper jurisdiction over this case.

Finally, Petitioner's claim that counsel was ineffective for failing to raise this issue fails. See Spencer, 447 F.3d at 16 (holding that "counsel could not have rendered ineffective assistance in failing to object to alleged errors of state evidentiary law that were either non-prejudicial or nonexistent"); Nickoyan Wallace, 526 F. Supp. 2d at 291 ("Because this Court has already determined that the use of both photos was proper, . . . counsel's failure to object to them cannot be deemed deficient.").

This Court finds Petitioner's jurisdictional claim to be meritless. There was and is no basis on which to doubt the Court's jurisdiction over this matter. Accordingly, Ground Fourteen is rejected.

### 9.   Ground Fifteen

Finally, Petitioner argues that his sentence is illegal because "the district court's reapplication/application of upward departures and enhancements for [ ]extreme psychological injury, physical restraint of victim, weapons and dangerous

instrumentalities, disruption of a government function, and criminal history was error of constitutional and legal dimensions." (Addendum to Mot. 2, ECF No. 258-1.)  This Court rejects each of these challenges.

As noted in Section I, supra, Petitioner challenged his sentence twice on appeals to the First Circuit.  He is currently serving a 294 month sentence; his challenges to this sentence were rejected on direct appeal.[27] United States v. Wallace, 573 F.3d 82, 84 (1st Cir. 2009) (Wallace II) (where the First Circuit discussed at length the sentence this Court imposed on Petitioner on remand and affirmed the sentence in all respects).

Relevant to the instant Motion, Petitioner sought reconsideration of this Court's departures from the sentencing range for dangerous weapons and disruption of government function, which the First Circuit had held in Petitioner's first appeal were valid grounds for departure. See Wallace I, 461 F.3d at 43.  The First Circuit declined to revisit those issues based on the law of the case doctrine. Wallace II, 573 F.3d at 91-92. Following the First Circuit's lead, this Court rejects the current challenges to his sentence on those grounds.

---

[27] In both appeals, Petitioner challenged the substantive reasonableness of his sentence as a whole.  The First Circuit did not reach this issue in the first appeal. Wallace I, 461 F.3d at 45.  On appeal after remand, the First Circuit rejected this challenge to his sentence. Wallace II, 573 F.3d at 97-98.

In addition, Petitioner challenged two sentencing enhancements (one for obstruction of justice and the other for use of stolen weapons) that he had not raised in his first direct appeal. Id. at 90-91. Again, the First Circuit found these challenges barred by the law of the case doctrine. Id. This Court rejects those challenges as well.

The First Circuit has therefore already addressed—and rejected—two of the challenges to the sentence imposed on remand that Petitioner raises in his Motion, and found that other challenges were inappropriately before the appellate court.[28] With respect to the two claims that the First Circuit found appropriate for its consideration, it noted that this Court did exactly what the First Circuit had found lacking in the Court's initial sentencing determination. It provided evidence to support the upward departure based on extreme psychological injury and explanation for the horizontal departure in Petitioner's criminal history category. Wallace II, 573 F.3d at 87, 94-95, 96.

Based on the foregoing, the Court rejects Petitioner's claims of error regarding sentencing, as well as any claim of

---

[28] It is not clear whether Petitioner challenges the enhancement for the use of stolen weapons in this Court. (Mem. 42-56, ECF No. 258-3.) In any event, any challenge on this ground would be rejected based on the First Circuit's finding that the claim was barred by the law of the case doctrine.

ineffective assistance of counsel relating to any of the sentencing challenges discussed above.

C.   Other Motions

1.   Request for Expedited Disposition

The Request for Expedited Disposition in § 2255 Proceeding (ECF No. 259) is DENIED as moot.

2.   Motion for Evidentiary Hearing and Counsel

The Court has already denied the portion of the Motion for Evidentiary Hearing and Appointment of Counsel (ECF No. 268) that requested an evidentiary hearing. See n.1, supra. Petitioner's request for counsel is also DENIED, as he has not demonstrated that "the interests of justice" require the appointment of counsel. 18 U.S.C. § 3006A(a)(2). Accordingly, the Motion for Evidentiary Hearing and Counsel (ECF No. 268) is DENIED in its entirety.

3.   Request for Transcripts

Petitioner filed a request for transcripts of the Grand Jury proceedings related to the original and superceding indictments. (ECF No. 269.)  The reason for the request is unclear.  Petitioner checked the boxes for "appeal" and "civil," but no appeal is pending.  In any event, the request for transcripts is DENIED as moot.

4.    Motion to Amend

On May 16, 2016, Petitioner filed a motion for leave to amend the pending Motion. (ECF No. 273.)  Because the Motion has been denied, the motion to amend is also DENIED as moot.

IV.  Conclusion

Petitioner is, in essence, seeking a new trial before this Court by way of presenting his due process and other claims as ineffective assistance of counsel claims.   This is not the function of a § 2255 motion.  See Hill, 368 U.S. at 427.  Petitioner's grounds for relief are rejected in their entirety.  Accordingly, the Motion (ECF No. 258) is DENIED.

## RULING ON CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings in the United States District Courts, this Court hereby finds that this case is <u>not</u> appropriate for the issuance of a certificate of appealability (COA) because Petitioner has failed to make "a substantial showing of the denial of a constitutional right" as to any claim, as required by 28 U.S.C. § 2253(c)(2).  Petitioner is advised that, also pursuant to Rule 11(a), any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter.


IT IS SO ORDERED.

_____

William E. Smith
Chief United States District Judge
Date: January 24, 2017